# UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF TENNESSEE
## NASHVILLE DIVISION

PATRICIA A. CROCKER,          )
                                   )
      **Plaintiff,**             )
                                   )
**v.**                              )     **Civil No. 3:14-cv-2038**
                                   )     **Judge Aleta A. Trauger**
                                   )
INTERSTATE PACKAGING COMPANY,  )
                                   )
      **Defendant.**           )

## MEMORANDUM

The defendant, Interstate Packaging Company ("Interstate"), has filed a Motion for Summary Judgment (Docket No. 23), to which the plaintiff has filed a Response (Docket No. 28), and Interstate has filed a Reply (Docket No. 32).  The plaintiff has also filed a Motion for Permission to File a Sur-Reply (Docket No. 34), and Interstate has filed an Opposition to that motion (Docket No. 35).  For the following reasons, the plaintiff's Motion for Permission to File a Sur-Reply will be granted, and Interstate's Motion for Summary Judgment will be granted in part and denied in part.

## FACTS[1]

This case arises from the plaintiff's employment as a customer service representative

---

[1] Unless otherwise noted, the facts recounted in this section are drawn primarily from Interstate's Statement of Undisputed Material Facts (Docket No. 24), Ms. Crocker's response thereto (Docket No. 28-1), Ms. Crocker's Additional Statements of Material Facts (*id.*), and Interstate's response thereto (Docket No. 31).  This section also contains facts from Interstate's Motion for Summary Judgment and Memorandum of Law in Support thereof (Docket Nos. 23, 26), Ms. Crocker's Response Memorandum (Docket No. 28), and Interstate's Reply (Docket No. 32), that are not refuted or contradicted by the opposing party or the record.  Where there is a genuine dispute of fact, the court will construe the fact in the light most favorable to Ms. Crocker as the non-moving party.

("CSR") with Interstate, a Tennessee corporation that manufactures and prints flexible packaging, labels, bags, and pouches. Ms. Crocker alleges that Interstate failed to pay her overtime wages throughout her employment, failed to provide reasonable accommodation for her physical limitations after she injured her arm at home in December of 2012, and improperly terminated her in April of 2013 after she requested leave for a surgery that she needed for her injured arm.

## I.  <u>Ms. Crocker's Employment as a Customer Service Representative</u>

Ms. Crocker was employed as a CSR at Interstate from spring of 2011 to April 29, 2013, when she was terminated. As a CSR, Ms. Crocker acted as the primary in-house contact for certain customer accounts. When she was hired, Ms. Crocker spent two months in training with other CSRs to learn to use Interstate's computer system and how to properly enter customer orders. Ms. Crocker also trained with employees in Interstate's Purchasing, Production, Art, and Estimating departments to become familiar with the overall production process before she was assigned her own accounts as a CSR. Both before and after her injury in December of 2012, Ms. Crocker was Interstate's CSR for three customers: Nature's Bounty, U.S. Tobacco, and Coty.

As a CSR, Ms. Crocker interacted directly with her assigned customers – usually by telephone or email, but occasionally in person at Interstate's facility – to enter purchase orders and to prepare quotes for printing jobs for labels or packaging. When placing an order, a customer would submit a purchase order requesting a product covered by the existing contract between it and Interstate or request a quote for a new product that was not covered by any contract. In the first situation, a customer would place the order by preparing and forwarding a purchase order form, which includes the quantity of product the customer is ordering, the unit

price for that order based on the customer's contract with Interstate,[2] and the customer's calculation of total order cost based on the quantity and unit price. When she received a purchase order from a customer, Ms. Crocker would enter the data into Interstate's customer order entry system and verify the unit pricing for the job by reviewing the customer's contract with Interstate. If the unit price used by the customer to calculate the total cost of the order did not match the contract price, Ms. Crocker would notify the customer of the correct price before confirming the order.

When a customer would request a new product that was not covered by an existing contract between the customer and Interstate, Ms. Crocker would prepare a quote for the order. Preparing a quote required Ms. Crocker to gather information regarding the order – such as color preference, liner type, size, delivery specifications, and any other special requirements – from the customer so that she could send the order details to Interstate's Estimating department for the determination of a unit price. Ms. Crocker would then call a production meeting with the managers from Interstate's various departments – Art, Production, Sales, Estimating, and Customer Service (including Ms. Crocker's own supervisor, Joe Matt) – to discuss the order and to gather additional information necessary for the calculation of a unit price. These meetings, which were led by Ms. Crocker, would typically last thirty minutes to an hour. If, after the meeting, the various departments determined that additional information was needed from the customer to create an accurate quote, either Ms. Crocker or the Sales department would contact

---

[2] It appears from the record that Interstate charged its customers according to unit prices that varied depending on the volume in which the customer ordered a particular printing job. Typically, therefore, if a customer ordered in a high volume, the unit price would be lower than if the customer ordered in a lower volume.

the customer to obtain the information.[3]  Once Ms. Crocker had all of the relevant information

for the order, she would prepare an initial quote for the job, which she would submit to the

Estimating department for the calculation of a unit price.  After she received a price from

Estimating, Ms. Crocker would send the quote to the customer, who could either accept or reject

the price quote.  If the customer accepted the unit price in the final quote, it would send in a

purchase order specifying the quantity it wished to order, the unit price for that quantity, and its

calculation of the total order cost, which Ms. Crocker would verify and enter into Interstate's

system.  If the customer did not accept the quote, Ms. Crocker would notify Sales or Estimating

for a decision on whether to adjust the unit price.

After a purchase order was accepted and the pricing confirmed, the order would proceed

through the production process.  During production, which could take three weeks or longer,

Ms. Crocker would monitor the order's status so that she could communicate with the customer

regarding the order.  For example, if technical difficulties resulted in a product being shipped

later than originally promised, Ms. Crocker was responsible for informing the customer of the

delay and dealing with any additional issues.

The parties mostly agree on the general contours of Ms. Crocker's duties as a CSR,

though they have not submitted any job description, training materials, or other company

documents that describe the CSR position or outline the duties and required skills for that

position,[4] so it is difficult to reconcile the parties' differing characterizations of those duties

_____

[3] Ms. Crocker estimates that, when these situations arose, she contacted the customer 75% of the time and someone from the Sales department contacted the customer the other 25% of the time.

[4] The transcript of Ms. Crocker's deposition, filed by Interstate in support of the Motion, notes that Exhibit 4 to the deposition was the job description for the CSR position.  (Docket No. 27, 3:10.)  Ms. Crocker's testimony regarding Exhibit 4 is not, however, sufficiently descriptive

(which the court will not go into here). What is clear from the record is that one of Ms. Crocker's primary duties was "entering customer purchase orders and quotes, which occupied about 65–75% of [her] time." (Docket No. 31 ¶ 6.) It is also clear that, throughout the order and production process, Ms. Crocker's duties generally included communicating with customers, attending pre-quote and production meetings, keeping notes during meetings, gathering information regarding customer orders from customers and Interstate's various departments, and filling out various standard forms.

During her two years with Interstate, Ms. Crocker was a salaried employee and, therefore, did not earn an hourly wage. Ms. Crocker's starting salary was greater than $455 per week and only increased from there, and her final weekly salary was approximately $800. Ms. Crocker generally worked 40 hours per week but, occasionally, she worked more than that. In those weeks in which she worked more than 40 hours, Ms. Crocker was never compensated for the additional hours beyond her base weekly salary.

## II.   Ms. Crocker's Injury

On December 24, 2012, Ms. Crocker – who is left-handed – fell and injured her right arm, fracturing her distal radius and ulna. Ms. Crocker went to the emergency room for treatment, where she saw Dr. Brook Adams. During this visit, Dr. Adams allegedly told Ms. Crocker that she could return to "light duty" at Interstate on January 15, 2013.[5] On December

---

for the court to determine the contents of the job description, and the exhibits to Ms. Crocker's deposition have not been submitted in the record by either Interstate or Ms. Crocker.

[5] Interstate argues that "what Dr. Adams told Plaintiff is hearsay and irrelevant." (Docket No. 31 ¶ 9.) To the extent that this evidence is offered as evidence of Ms. Crocker's then-existing state of mind, including her motivation for requesting "light duty" from Interstate when she returned to work, it is an exception to the rule against hearsay and will be considered for that limited purpose. Fed. R. Evid. 803(3).

26, 2012, Ms. Crocker informed Interstate that she had injured her arm and would be out of work for "a couple of weeks." Two days later, on December 28, 2012, Beverly Coleman – Personnel Services Administrator at Interstate – sent Ms. Crocker a letter advising her of her rights and status under the Family Medical Leave Act ("FMLA"), 29 U.S.C. § 2601 *et seq*. Interstate placed Ms. Crocker on FMLA leave from the time she was injured until she returned to work on January 15, 2013. Interstate also sent to Dr. Adams for completion U.S. Department of Labor Form WH-380E, which certifies that an employee suffers from a serious medical condition and describes the condition and amount of leave needed. Dr. Adams filled out and returned the form to Interstate, providing the following instructions:

> May work with no use of right hand: 1/15/13. May do limited work including typing, but no lifting: 2/1/13. Estimated full return date with no restrictions: 3/11/13.

(Docket No. 28-1 ¶ 34.)

Ms. Crocker returned to work at Interstate on January 15, 2013. When she returned, Ms. Crocker met with Ms. Coleman to discuss Dr. Adams' instructions, and Ms. Crocker requested an accommodation from Interstate for her injured arm. The parties do not agree on the extent or exact nature of the accommodation that Ms. Crocker requested after her return (or even if she made a request), but because this is summary judgment, the court must construe all disputed facts in the light most favorable to Ms. Crocker as the non-moving party. According to Ms. Crocker, she requested that Interstate place her on "light duty", which, again according to Ms. Crocker, would have required a reduction in the amount of typing and data entry that she was required to do. (Docket No. 31 ¶¶ 9–10; Docket No. 28, pp. 11–12.) After Ms. Crocker's return, however, Interstate did not reduce her data entry workload, and her duties remained the same as before her injury.

On January 22, 2013, a week after she returned to work, Ms. Crocker found that she

could not flex her right thumb and had lost some use of her right index finger. Ms. Crocker again saw Dr. Adams, who recommended surgery. Ms. Crocker worked at Interstate until the day of her surgery: January 24, 2013. Interstate again placed Ms. Crocker on FMLA leave during her absence for this surgery, which lasted until January 30, 2013. When Ms. Crocker returned to work at Interstate on January 30, 2013, she had a hard cast on her right arm that extended from her hand to her elbow. According to Ms. Crocker, when she returned to work, she reminded Interstate that she needed to be on "light duty," but her duties remained the same as before her injury. (Docket No. 31 ¶ 12.) Due to difficulties with typing, Ms. Crocker claims that she had trouble entering data regarding customer orders into Interstate's computer system, and she had to work on weekends to complete her work.[6]

It was not until the first or second week of February of 2013 that Ms. Crocker first told someone at Interstate that she believed she needed assistance to perform her job, and she requested that Interstate hire another representative or assign an existing CSR to help her with her work.[7] Interstate denied her request because, according to Interstate, other employees were fully occupied with their own accounts and there was no budget to hire a new CSR. In mid-March of 2013, approximately six weeks before she was terminated, Ms. Crocker met with Matthew Wolf, one of Interstate's owners. In the meeting, Mr. Wolf explained to Ms. Crocker that she had made mistakes on a quote that she had given to U.S. Tobacco. Ms. Crocker told Mr. Wolf that she was "overworked," and Mr. Wolf responded that she should "continue to do

---

[6] The court notes that Interstate did provide its employees with a short term disability program which allowed an employee to receive 60% of her pay while disabled. It does not appear that Ms. Crocker ever enrolled in this program.

[7] The record does not contain information sufficient to identify whom at Interstate Ms. Crocker told that she needed assistance to perform her job.

the best [she] could and to concentrate on Customer Quotes and Customer Orders because they had priority over everything else." (Docket No. 28-1 ¶ 49.)

On April 22, 2013, Ms. Crocker claims that she told Ms. Coleman and Mr. Matt that she would need time off for another surgery on her right wrist, which had not yet been scheduled. A week later, on April 29, 2013, Teri Doochin – co-president of Interstate – called Ms. Crocker into her office, along with Mr. Matt and Julie Gleason, Interstate's Director of Human Resources. Ms. Doochin explained to Ms. Crocker that there were pricing errors in purchase orders on one of her accounts from the previous November and December (before Ms. Crocker's injury), which could have cost the company as much as $35,000. Ms. Crocker was allowed to return to work after the meeting with Ms. Doochin, but she was soon called into another meeting with Ms. Gleason and Mr. Matt. Together, the two advised Ms. Crocker that her employment was terminated. No one was hired to replace Ms. Crocker; rather, her workload was divided among and assumed by existing employees.

Ms. Crocker contends that she was terminated for failing to update one of Interstate's spreadsheets related to purchase orders and pricing. (Docket No. 27 (Dep. P. Crocker), 149:25–150:3 (answer by Ms. Crocker that she believed her employment was terminated at Interstate "[b]ecause [she] wasn't keeping up with the [pricing] spreadsheet".) When Ms. Crocker was asked during her deposition if she could "think of any other reason" why she was terminated, she answered: "No." (*Id.* at 150:4–6.) Interstate, on the other hand, contends that Ms. Crocker was terminated because she had allowed purchase orders with incorrect pricing information to be entered as orders. (Docket No. 26, p. 13.) Ms. Crocker challenges Interstate's proffered reason by pointing to a fellow CSR, Carolyn Fielder, who – according to Ms. Crocker – made similar mistakes with pricing information but was not terminated. According to Ms. Crocker,

Ms. Fielder was responsible for the U.S. Tobacco account before it was assigned to Ms. Crocker. Ms. Fielder made three or four large pricing errors on the account and was suspended for several days after the final error. Ms. Fielder was not, however, terminated for these errors but, rather, was transferred to another department in Interstate.

## PROCEDURAL HISTORY

On October 28, 2014, Ms. Crocker filed the Complaint against Interstate, alleging that Interstate: (1) violated the Fair Labor Standards Act ("FLSA"), 29 U.S.C. § 201, *et seq.*, when it failed to pay Ms. Crocker overtime wages for weeks in which she worked more than 40 hours; (2) violated the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101, *et seq.*, when it failed to provide her with her requested accommodation for her injured arm; and (3) violated the FMLA when it interfered with the leave she requested for her second surgery by terminating her before she could take it. (Docket No. 1.) Ms. Crocker requests back and front pay; compensatory, liquidated, and punitive damages; and attorney's fees and expenses. (*Id.* at p. 8.) After obtaining an extension of the deadline to respond the Complaint (Docket No. 10), Interstate filed an Answer on March 19, 2015 (Docket No. 13).

On September 18, 2015, Ms. Crocker sought an extension of the discovery deadline from September 20, 2015 to October 23, 2015 so that she could take the deposition of Interstate pursuant to Federal Rule of Civil Procedure 30(b)(6). (Docket No. 17.) Despite the short notice, the court granted the extension and also extended the deadlines for dispositive motions, but it noted in the Order that "plaintiff's counsel should not rely upon the court's leniency" in the future. (Docket No. 22.)

Interstate timely filed its Motion for Summary Judgment on November 9, 2015 (Docket No. 23), accompanied by a supporting Memorandum (Docket No. 26), a Statement of

Undisputed Material Facts ("SUMF") (Docket No. 24), the Declaration of Teri Doochin (Docket No. 25), and various exhibits, including the deposition of Ms. Crocker (Docket No. 27). On December 5, 2015, one day after the filing deadline, Ms. Crocker filed her Response (Docket No. 28), accompanied by a Response to Interstate's SUMF and Ms. Crocker's Additional Statements of Material Facts (Docket No. 28-1), the Declaration of Ms. Crocker (Docket No. 28-2), and other exhibits. Ms. Crocker also filed a Motion to Accept the Late Filing of her Response (Docket No. 29), which the court granted (Docket No. 33). On December 14, 2015, Interstate filed a timely Reply in support of its Motion and the Second Declaration of Ms. Doochin. (Docket Nos. 31, 32.) On December 22, 2015, Ms. Crocker filed a Motion for Permission to File a Sur-Reply (Docket No. 34) and, on December 28, 2015, Interstate filed an Opposition to the Motion, requesting that the court either deny Ms. Crocker's request or grant it permission to file a response to the proposed Sur-Reply (Docket No. 35).

## MOTION FOR PERMISSION TO FILE SUR-REPLY

In her Motion for Permission to File a Sur-Reply, Ms. Crocker argues that she should be allowed to address Interstate's arguments regarding "supposed defects" in her Response to Interstate's SUMF, new issues raised in the Reply, and Interstate's "misstate[ments]" of her position. (Docket No. 34.) The only new issue from Interstate's Reply that Ms. Crocker's Sur-Reply addresses is Interstate's argument that it is entitled to summary judgment on her FMLA claim because she admitted in her deposition that the only reason she believed she had been terminated was because she could not "keep[] up with the [pricing] spreadsheet." The court will grant Ms. Crocker's Motion for Permission to File a Sur-Reply for the limited purpose of considering her response to this argument. *See Seay v. Tenn. Valley Auth.*, 339 F.3d 454, 481 (6th Cir. 2003) (noting that sur-replies are appropriate "[w]hen new submissions and/or

arguments are included in a reply brief, and a nonmovant's ability to respond to the new evidence has been vitiated").

The court will not, however, consider the portions of the Sur-Reply that merely rehash Ms. Crocker's arguments from her Response that (1) she did request a reasonable accommodation for the limitations imposed on her by her injury, and (2) Interstate interfered with her requested leave for her second surgery by terminating her.  (Docket No. 34-1.)  With respect to the "supposed defects" in Ms. Crocker's Response to Interstate's SUMF (Docket No. 28-1 ¶¶ 14, 22–24, 26, 66, 68), the court has examined the factual basis cited by Interstate in the SUMF and, in many of the cases, determined that the dispute between the parties was a dispute regarding characterization of the testimony, which the court must construe in favor of Ms. Crocker.  Ms. Crocker's additional arguments regarding those facts are not, therefore, appropriate or necessary, and the court will not consider them.[8]  The court also concludes that no additional response from Interstate would be helpful to or necessary for disposition of the pending Motion for Summary Judgment, and the court, therefore, denies Interstate's request to file a response to the Sur-Reply.

## MOTION FOR SUMMARY JUDGMENT

### I. Legal Standard

Federal Rule of Civil Procedure 56 requires the court to grant a motion for summary judgment if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  If a moving defendant shows that there is no genuine issue of material fact as to at least one essential element of the

---

[8] The court notes that Ms. Crocker doesn't provide any explanation in the Sur-Reply for the one argument regarding her Response to Interstate's SUMF that warrants a response: her failure to respond to paragraph 67.

plaintiff's claim, the burden shifts to the plaintiff to provide evidence beyond the pleadings, "set[ting] forth specific facts showing that there is a genuine issue for trial." *Moldowan v. City of Warren*, 578 F.3d 351, 374 (6th Cir. 2009); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986). Conversely, a moving party bearing the burden of proof on a claim must show that the non-moving party cannot raise a genuine issue of fact regarding any element of the relevant claims. In both instances, "[i]n evaluating the evidence, the court must draw all inferences in the light most favorable to the non-moving party." *Moldowan*, 578 F.3d at 374 (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)).

At this stage, "'the judge's function is not . . . to weigh the evidence and determine the truth of the matter, but to determine whether there is a genuine issue for trial.'" *Id.* (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986)). But "[t]he mere existence of a scintilla of evidence in support of the [non-moving party's] position will be insufficient," and the party's proof must be more than "merely colorable." *Anderson*, 477 U.S. at 252. An issue of fact is "genuine" only if a reasonable jury could find for the non-moving party. *Moldowan*, 578 F.3d at 374 (citing *Anderson*, 477 U.S. at 252).

## II.   <u>Analysis</u>

### A.    **Overtime Wages Under the Fair Labor Standards Act**

Ms. Crocker alleges that, during her employment with Interstate, the company failed to pay her overtime wages as required by the FLSA. The FLSA establishes a minimum wage for employers to pay each of their employees and requires employers to compensate such employees one and one-half times their regular hourly pay for every hour they work in excess of forty hours per week. 29 U.S.C. §§ 206(a)(1), 207(a)(1). The FLSA includes, however, several categories of employees for whom employers are exempt from these requirements, including executive,

administrative, professional, and outside sales positions. 29 U.S.C. § 213(a)(1). The definitions

of these positions are to be narrowly construed against the employer who asserts the exemption.

*Baden–Winterwood v. Life Time Fitness, Inc.*, 566 F.3d 618, 626 (6th Cir. 2009). Indeed, FLSA

overtime exemptions are "affirmative defense[s] on which the employer has the burden of

proof." *Thomas v. Speedway SuperAmerica, LLC*, 506 F.3d 496, 501 (6th Cir. 2007) (quoting

*Corning Glass Works v. Brenna*, 417 U.S. 177, 196–97 (1974)); *accord Elwell v. Univ. Hosps.*

*Home Care Servs.*, 276 F.3d 832, 837 (6th Cir. 2002).

Interstate does not deny that it failed to pay Ms. Crocker overtime wages but, instead,

asserts that Ms. Crocker was exempt from the FLSA's overtime pay requirements because she

was employed in an administrative capacity under 29 U.S.C. § 213(a)(1). (*See* Docket No. 26,

pp. 4–9.) FLSA regulations – promulgated by the Department of Labor – provide that an

"employee employed in a bona fide administrative capacity" is any employee:

> 1) Compensated on a salary or fee basis at a rate of not less than $455 per
>    week . . . exclusive of board, lodging or other facilities;
>
> 2) Whose primary duty is the performance of office or non-manual work
>    directly related to the management or general business operations of the
>    employer or the employer's customers; and
>
> 3) Whose primary duty includes the exercise of discretion and independent
>    judgment with respect to matters of significance.

29 C.F.R. § 541.200(a). The regulations further provide that "the exercise of discretion and

independent judgment involves the comparison and the evaluation of possible courses of

conduct, and acting or making a decision after the various possibilities have been considered."

*Id.* § 541.202(a).

Interstate contends that the undisputed facts demonstrate that it properly classified

Ms. Crocker as an administrative employee exempt from the FLSA's overtime requirements.

(Docket No. 26, pp. 4–9.) Because the employer bears the burden of proving that its employee's

13

position was exempt, Interstate must demonstrate that Ms. Crocker cannot raise a genuine issue of fact regarding any element of the exemption. Ms. Crocker does not dispute that she was compensated at a rate of more than $455 per week, nor does she dispute that she performed "office or non-manual work" related to Interstate's customers. (*See* Docket No. 28-1 ¶ 4.) As described below, however, the court finds that a genuine dispute of material fact exists as to whether Ms. Crocker's primary duty included the exercise of discretion and independent judgment with respect to matters of significance.

While it is undisputed that Ms. Crocker's primary duty was to prepare customer purchase orders and quotes and enter data relating to those orders and quotes into Interstate's computer system, (Docket No. 31 ¶ 6), the record is unclear as to whether Ms. Crocker exercised discretion and independent judgment while performing that duty. Interstate argues that Ms. Crocker did exercise discretion and independent judgment as she "guide[d] the customer through the price quoting, production, and shipping processes." (Docket No. 26, p. 8.) According to Interstate, Ms. Crocker did not have a "simple data entry job" but, rather, was in charge of setting and leading meetings with Interstate department managers and reviewing lengthy customer contracts to obtain "necessary information." (*Id.* at pp. 8–9.) Furthermore, Interstate contends, Ms. Crocker was responsible for keeping Interstate's customers happy and maintaining long-term relationships, which required her to respond to varying requests and changing circumstances. (Docket No. 32, pp. 5–7.) According to Interstate, Ms. Crocker was not a "mere conduit of information between the customer and management," because, if she was, it would make no sense for Interstate to pay her for a job that could be accomplished by "answering machines and email." (*Id.* at p. 6.)

Ms. Crocker, on the other hand, argues that her work on customer purchase orders and

14

quotes – which included gathering and entering data, communicating with the client, and attending pre-quote and production meetings – was "entirely clerical" and did not involve the exercise of any discretion or independent judgment. (Docket No. 28, pp. 8–9.) Ms. Crocker notes that entering customer orders into Interstate's system "occupied about 65–75% of [her] time" – a fact that Interstate has not disputed – and that she did not play any role in actual price determination or negotiation, because purchase order prices were set by the customer's contract price or by the Estimating department. (*See* Docket No. 28, p. 8; Docket No. 31 ¶ 6.). She takes issue with Interstate's characterization of the meetings she "led," noting that she only set a time for the meeting and that any discretion or judgment that was exercised during those meetings was actually exercised by the department managers. (Docket No. 28, p. 9.) Finally, Ms. Crocker argues that following a customer's order through the production process and interacting with the customer along the way did not require her to consider various possibilities and make decisions for Interstate, because she merely communicated information between the customer and various department heads, who were the ultimate decision-makers. (*Id.*) Interstate and Ms. Crocker further disagree over whether Ms. Crocker was ultimately responsible for making sure that quotes sent to, and prices on purchase orders received from, the customer were correct (Docket No. 28-1 ¶¶ 9, 24) and what action she was expected to take if the customer entered an incorrect price on a purchase order (*id.* ¶ 22).

Interstate has failed to meet its affirmative burden of demonstrating that Ms. Crocker is exempt from the FLSA's overtime wage requirements. Interstate has produced no job description, training materials, or any other company documents that conclusively demonstrate that Ms. Crocker's position required the use of discretion and independent judgment, and the parties' arguments are premised almost entirely on Ms. Crocker's own deposition testimony,

which lacks key details that could help to resolve this dispute.  For example, the record contains no information regarding Ms. Crocker's ability to commit Interstate in matters that have significant financial consequences, negotiate on its behalf on significant matters, or deviate from established policies and procedures.  *See* 29 C.F.R. § 541.202(b) (listing these factors, among others, as information to be considered when determining whether an employee exercises discretion and independent judgment).  Ultimately, the parties' evidence boils down to differing characterizations of Ms. Crocker's duties, and "it must be left to a trier of fact to weigh the credibility of the parties' contradictory characterization[s] of [the plaintiff's] day-to-day duties." *Henry v. Quicken Loans, Inc.*, 698 F.3d 897, 901 (6th Cir. 2012) (internal quotation marks omitted).

The court concludes that a genuine dispute of material fact exists regarding the degree to which Ms. Crocker exercised independent judgment and discretion as a CSR, if at all.  Interstate, therefore, has not met its burden of demonstrating that all elements of the exemption apply, and, accordingly, the court will not grant summary judgment to Interstate on Ms. Crocker's claim for overtime wages under the FLSA.

### B.    Reasonable Accommodation Under the Americans with Disabilities Act

Ms. Crocker contends that Interstate violated the ADA when it failed to grant her a reasonable accommodation – a reduction in her data entry duties – for her injured arm.[9]  The ADA prohibits an employer from "discriminat[ing] against a qualified individual on the basis of disability." 42 U.S.C. § 12112(a).  Discrimination under the ADA includes an employer's failure to make "reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual who is an applicant or an employee, unless such covered entity

_____

[9] Ms. Crocker has conceded that she is not pursuing a claim under the ADA related to her termination.  (Docket No. 28, p. 13.)

can demonstrate that the accommodation would impose an undue hardship on the operation of the business of the covered entity." *Id.* § 12112(b)(5)(A); *see also Kleiber v. Honda of Am. Mfg., Inc.*, 485 F.3d 862, 868 (6th Cir. 2007). To advance a failure to accommodate claim under the ADA, an employee must show that she requested a reasonable accommodation and that the employer failed to provide the necessary accommodation. *Myers v. Cuyahoga Cnty*, 182 F. App'x 510, 515 (6th Cir. 2006). It is important to note that an employee's request to be relieved from an essential function of her position, or to have that essential function shifted to other employees, is not, as a matter of law, a reasonable accommodation. *See Bratten v. SSI Servs., Inc.*, 185 F.3d 625, 632 (6th Cir. 1999); *see also Williams v. Prospect, Inc.*, No. 3:13-cv-0829, 2015 WL 1543500, at *4 (M.D. Tenn. Apr. 7, 2015) (collecting cases from other circuits illustrating this point). Nor is it reasonable to request that an employer create a new position or hire new employees to accommodate a disabled worker. *See Bratten*, 185 F.3d at 632; *Brown v. Chase Brass & Copper Co., Inc.*, 14 F. App'x 482, 488 (6th Cir. 2001).

Ms. Crocker contends that Interstate failed to reasonably accommodate her disability by refusing to "reduce the amount of typing and data entry that she was asked to do" and to reallocate her data entry work among the CSRs or hire a new CSR to assist her. (Docket No. 28, pp. 11–13.)[10] The parties dispute whether Ms. Crocker ever explicitly made this request but, regardless of whether she did or not, Ms. Crocker's request for an accommodation consisting of a reduction in the amount of data entry she was required to do was not – as a matter of law – a request for a *reasonable* accommodation. While it is true that the ADA requires "job

---

[10] Ms. Crocker repeatedly alleges in the Complaint and in her affidavit that Interstate did not decrease her workload after she requested "light duty." (Docket No. 1 ¶¶ 44, 49, 60; Docket No. 28-2 (Aff. P. Crocker) ¶¶ 10, 12.) In her Response, however, Ms. Crocker clarifies that she did not request "an overall decreased workload, but rather . . . a decrease in the amount of data entry being required of [her]." (Docket No. 28, p. 12.)

restructuring" as a "reasonable accommodation" in appropriate circumstances, 42 U.S.C. § 1211(9)(B), that restructuring pertains only to "non-essential duties or marginal functions of a job," *Bratten*, 185 F.3d at 632. Put simply, reasonable job restructuring may only involve the shifting of *non-essential* duties to other employees. *Id.*; *see also Dvorak v. Mostardi Platt Assocs., Inc.*, 289 F.3d 479, 484 (7th Cir. 2002) ("Under the ADA, an employer is not required to modify, reduce, or reallocate the essential functions of a job to accommodate an employee.").

Although the employer bears the burden of proving that a challenged job criterion is essential, Ms. Crocker concedes that data entry is essential to her job duties. One indication of whether or not a job duty is an essential function is "the amount of time spent on the job performing the function." 29 C.F.R. § 1630.2(n)(3). Ms. Crocker admits that one of her primary duties was "entering customer purchase orders and quotes, *which occupied about 65–75% of [her] time*." (Docket No. 31 ¶ 6 (emphasis added).) Furthermore, when Ms. Crocker argues in her Response that she is not exempt from the overtime requirements of the FLSA, she states that her duties as a CSR "consisted *primarily* of entering data for customer orders, bids, quotes, and returns into the computer system." (Docket No. 28, p. 7 (emphasis added).) Because data entry was fundamental to Ms. Crocker's job, Interstate was not required to reallocate data entry duties among its CSRs to reduce the amount of data entry that Ms. Crocker had to do. *See Bratten*, 185 F.3d at 632. Nor was Interstate required to assign another CSR to assist Ms. Crocker with data entry or hire a new employee to do so. *Id.*

Accordingly, because the accommodation proposed by Ms. Crocker was unreasonable as a matter of law, the court will grant summary judgment to Interstate on Ms. Crocker's claim of

failure to provide reasonable accommodation under the ADA.[11]

## C.   Interference with Rights Under the Family Medical Leave Act

Ms. Crocker asserts that Interstate interfered with her rights under the FMLA when it terminated her after she informed the company that she would need to take leave for a surgery.[12] Under the FMLA, employees are entitled to take twelve weeks of leave for, among other things, "a serious health condition that makes the employee unable to perform the functions of the position of such employee." 29 U.S.C. § 2612(a)(1)(D). The FMLA makes it illegal for an employer to "interfere with, restrain, or deny the exercise of or the attempt to exercise, any right provided under [the FMLA]." 29 U.S.C. § 2615(a)(1). To succeed on an interference claim, a plaintiff must show that: "(1) [she] was an '[e]ligible employee;' (2) the defendant was an '[e]mployer' covered under the FMLA; (3) the employee was entitled to leave under the FMLA; (4) the employee gave the employer notice of [her] intention to take leave; and (5) the employer denied the employee FMLA benefits to which [she] was entitled." *Wysong v. Dow Chem. Co.*, 503 F.3d 441, 447 (6th Cir. 2007) (internal citations omitted) (quoting *Cavin v. Honda of Am. Mfg., Inc.*, 346 F.3d 713, 719 (6th Cir. 2003)).

---

[11] Interstate also argues that, with her alleged disability, Ms. Crocker was not qualified for her position as a CSR, with or without a reasonable accommodation. (Docket No. 26, p. 11.) Because the court concludes that Ms. Crocker's requested accommodation was not reasonable as a matter of law, the court does not reach the merits of this argument.

[12] The court notes that, even though she has never pursued this theory, Ms. Crocker's allegation that Interstate terminated her following her request for FMLA leave could also be construed as a claim that Interstate retaliated against her for exercising her rights under the FMLA. *Wallner v. Hilliard*, 590 F. App'x 546, 551 (6th Cir. 2014) ("[F]iring someone who has just requested FMLA leave before he can take it could be construed both as retaliation for having asked for leave and as interference with the employee's ability to take it."). Even if the court were to construe Ms. Crocker's claim as one for retaliation, however, the claim would fail for the same reasons as those discussed herein.

The Sixth Circuit has recognized that "the FMLA is not a strict-liability statute," and "the mere occurrence of interference with an employee's FMLA rights is not a *per se* FMLA violation." *Ritenour v. Tenn. Dep't of Human Servs.*, 497 F. App'x 521, 530 (6th Cir. 2012) (internal citations omitted). Rather, "interference with an employee's FMLA rights does not constitute a violation if the employer has a legitimate reason unrelated to the exercise of FMLA rights for engaging in the challenged conduct." *Grace v. USCAR*, 521 F.3d 655, 670 (6th Cir. 2008) (quoting *Edgar v. JAC Prods., Inc.*, 443 F.3d 501, 508 (6th Cir. 2006)). If the defendant offers a legitimate reason for the challenged conduct, the plaintiff must then demonstrate that the proffered reason is pretextual by showing that it had (1) no basis in fact, (2) did not motivate the adverse employment action, or (3) was insufficient to warrant the adverse employment action. *Id.* (citing *Wexler v. White's Fine Furniture*, 317 F.3d 564, 567 (6th Cir. 2003)).

No one could seriously dispute that Ms. Crocker's termination prevented her from taking the previously requested leave for a second surgery on her arm; it would be impossible for her to take leave from a job that she no longer had. The mere fact that her termination interfered with her requested FMLA leave does not, however, necessarily prove that Interstate violated the FMLA. Ms. Crocker must also demonstrate that her termination was related to her request for leave under the FMLA and that any other allegedly legitimate reason for her termination was pretextual. Ms. Crocker cannot, however, make such a showing as a matter of law, because she has conceded through her own testimony that Interstate's reason for terminating her was unrelated to her exercise of FMLA rights. When asked during her deposition why she "th[ought] her employment was terminated at Interstate," Ms. Crocker replied: "Because I wasn't keeping up with the [pricing] spreadsheet." (Docket No. 27 (Dep. P. Crocker), 149:25–150:3.) Ms. Crocker was then asked if she could "think of any other reason" why she was terminated,

and she answered: "No." (*Id.* at 150:4–6.)

Ms. Crocker argues in her Sur-Reply that this testimony is irrelevant, but such an argument is without merit. (Docket No. 34-1, p. 7.) First, this concession is excerpted directly from Ms. Crocker's deposition, taken on August 19, 2015, over a year after she was terminated and almost a year after she filed the Complaint, (*see* Docket No. 27), and it is not, as Ms. Crocker argues, a mere statement of her "initial[] belie[f]" as to why she was terminated. (Docket No. 34-1, p. 7.) Second, Ms. Crocker's belief as to the reason for her termination is very relevant. If she believes that she was terminated because of certain aspects of her job performance *and for no other reason*, then she cannot truthfully and in good faith advance a claim premised on arguments that her termination was related to her request for leave under the FMLA and that any other reason for her termination is pretextual.

Accordingly, the court concludes that there is no genuine dispute of fact as to whether Interstate interfered with Ms. Crocker's rights under the FMLA, and the court will grant summary judgment to Interstate on Ms. Crocker's claim under the FMLA.

## CONCLUSION

For the reasons discussed herein, the plaintiff's Motion for Permission to File a Sur-Reply will be granted, and Interstate's Motion for Summary Judgment will be granted in part and denied in part. Specifically, summary judgment as to Ms. Crocker's claims for failure to provide reasonable accommodation under the ADA and interference with rights under the FMLA will be granted to Interstate. The motion as to Ms. Crocker's claim for overtime wages under the FLSA will be denied.

An appropriate order will enter.

ALETA A. TRAUGER
United States District Judge